UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
TANVIR AMNA,

                Plaintiff,

-against-

NEW YORK STATE DEPARTMENT OF HEALTH,
THE STATE OF NEW YORK

                Defendant.
------------------------------------------------------------------x

**NOT FOR PUBLICATION**
**MEMORANDUM & ORDER**
08-CV-2806 (CBA)(LB)

AMON, Chief United States District Judge:

       Plaintiff Tanvir Amna ("Amna" or "the plaintiff"), pro se, has brought suit against her

former employer, the New York State Department of Health ("DOH") alleging discrimination on

the basis of national origin and religion, as well as retaliation, in violation of Title VII of the

Civil Rights Act, 42 U.S.C. § 2000e et seq.  In particular, Amna alleges that while employed at

DOH, she was subject to both disparate treatment and a hostile work environment, and that the

DOH retaliated against her for filing charges of discrimination with the New York State Division

of Human Rights ("DHR").  Amna also brings claims under 42 U.S.C. § 1981, and under the

New York State Human Rights Law, N.Y. Exec. Law § 290 et seq.  Defendant DOH now moves

for summary judgment, seeking dismissal of the complaint in full.  For the reasons set forth

below, the defendant's motion for summary judgment is granted.


I.      **Background**

       The plaintiff, Tanvir Amna, is a Muslim woman of Pakistani descent.  From October

2001 until September 2009, she was employed as a Public Health Social Work Consultant at the

DOH's Metropolitan Area Regional Office, located in Central Islip.  She began in the Bureau of

Long Term Care, Survey Unit, but was transferred to the bureau's Complaint Unit, located in the same office, on May 3, 2007.  (Defs. 56.1 Stmt. ¶ 4.)

Both of Amna's positions were part of the DOH's Division of Quality and Surveillance for Nursing Homes, which licenses nursing homes and investigates quality of care complaints within the state of New York.  (Id. ¶ 5.)   In the Survey Unit, teams of DOH employees conduct yearly recertification surveys of nursing homes in order to determine and maintain compliance with federal and state regulations.  (Id. ¶¶ 6, 8.)  These surveys are unannounced visits by trained DOH professionals who specialize in nursing, nutrition, social work, pharmacy, physical therapy, and the environment.  (Id. ¶ 7.)  During the survey, DOH staff conducts interviews, makes observations, and reviews medical records and other facility documentation.  (Id. ¶ 12.)  The Complaint Unit investigates specific complaints about nursing homes, and conducts similar but more targeted surveys in response.  (Id. ¶¶ 6, 12.)  DOH surveyors and complaint investigators set forth violations in reports called Statements of Deficiency ("SODs"), which are compiled and ultimately forwarded to the facility so that it may prepare a Plan of Correction.

The parties dispute the circumstances surrounding Amna's hiring in 2001.  She alleges that she was offered and accepted a position at pay grade 22, but was placed at pay grade 19 once she started working.  (Compl. ¶ 12.)  One of Amna's former supervisors, Christine Cain, also testified that in 2001, soon after Amna began working, she received a phone call from the DOH central office asking if Amna had been trying to "push her religion" on others.  (Cain Dep. at 58.)  According to Amna, this phone call followed shortly after a co-worker had asked her for some informative literature on Islam, which she gave to him at the office.  (Pl. Opp'n at 10.)  Amna also alleges that in 2002, a recently hired Indian co-worker told her that she did not like Pakistanis.  (Compl. at ¶ 14.)

2

Starting principally in 2005, Amna alleges that many of her colleagues and supervisors began discriminating against her on the basis of her religion and her national origin. She claims that team leaders and supervisors repeatedly yelled at her and told her that they could not understand her when she spoke. (Compl. ¶¶ 16, 17, 19, 26, 28, 30, 37, 39.) On one occasion in August 2005, she alleges that she was yelled at by a supervisor, Eileen Beck, when she was talking with a co-worker in her native language. (Id. ¶ 16.) In the fall of 2005, Amna claims that her team leader, Ann Marie Sammut, grabbed her by the shoulders and pulled her up from her chair when she inquired about why she needed to attend a meeting. (Id. ¶ 23.) On or around December 22, 2005, Amna found sexually–related literature left on her desk. (Id. ¶ 27.) Amna claims to have reported some of these incidents to managers, but no actions were taken. (Id. ¶ 27, 30, 34, 48.) In addition, an office secretary, Nadine Target, relayed to her in December 2006 that a supervisor, Mary Ann Robertson, had referred to her as an "evil" in the office, and that another secretary, Dennis Tumminelli, said that Amna prays to animals. (Pl. Dep. at 149; Pl. Opp'n at 8, 45.) Amna also claims a co-worker once laughed in front of her at a cartoon that was offensive to Muslims, and that supervisor Vastie Vinson once asked Amna if she had spent her vacation in Iraq. (Pl. Dep. at 157, 160.)

According to Amna, during her time in the Survey Unit, she was excluded from certain meetings, and was rotated between survey teams because colleagues did not want to work with her. (Id. ¶¶ 16, 25, 47, 49, 5.) Amna also claims that Vinson did not offer her as many overtime opportunities as she did to another employee, Usha Mehta. (Id. ¶ 32.) Amna concedes that she never requested overtime. (Pl Dep. at 198-99.) She alleges that, unlike other team members, she was not offered rides to job sites in a state-provided car, and that her travel time in her own car was factored into her allowable work time, unlike those who rode in the state car. (Pl. Opp'n at

28-31.)  Amna also brings several allegations about how her work was reviewed, claiming it was excessively scrutinized and criticized, was edited without her knowledge, and was on certain occasions not included in the final reports issued to the nursing homes.  (Id. ¶¶ 33, 37, 40, 50, 51, 55, 65.)

Amna filed charges of discrimination with the New York Division of Human Rights in October of 2006.  She also began sending emails to supervisors documenting work incidents that she believed were hostile or discriminatory.  (Pl. Opp'n, Ex. 20, 34.)  Amna claims that following her DHR complaint, various retaliatory actions were taken against her.  She alleges that in late-October 2006, she hosted a breakfast to celebrate the end of Ramadan that no one attended.  (Pl. Dep. 150-151.)  Nadine Target informed Amna that she had overheard a supervisor, Kathy Behan, telling other employees that they should not attend the breakfast because Amna had filed discrimination charges.  In November 2006, Amna received a verbal counseling regarding complaints from nursing homes about her on-site behavior, and a counseling memo was placed in her personnel file.  (Compl. at ¶¶ 41-42; Cygan Aff., Ex. B.)  In April 2007, Amna was "interrogated" about additional problems with her job performance, including at least one other complaint from a nursing home, and was threatened with a one-month suspension, which was rescinded when she agreed to give up 5 days of vacation time.  (Pl. Opp'n at 48-49; Ex. 30, 31.)

The record contains emails sent among Amna's supervisors in April 2007 indicating that she had been rotated between survey teams because colleagues found her difficult to work with, and feared that she would bring more discrimination charges against them.  (Pl. Opp'n, Ex. 29.)  On May 1, 2007, management met with Amna and discussed the possibility of moving her to the Complaint Unit.  (Pl. Opp'n, Ex. 37.)  Amna stated in her deposition that she did not object to the

change and hoped that it would alleviate the problems she had been facing in her work

environment.  (Pl. Dep. at 224-26; Pl Opp'n, Ex. 37.)

On May 3, 2007, Amna was transferred from the Survey Unit to the Complaint Unit.

(Compl. ¶ 58.)  Once in the Complaint Unit, Amna claims that her access to a computer program

called ASPEN-ACO was removed, which hindered her ability to do her work.  (Compl. ¶ 59.)

She also claims that she was given an excessive workload that she was unable to complete on

time.  (Id. ¶ 60.)  She alleges that the excessive scrutiny of her work continued, and her SODs

were omitted from some of the final reports.  (Id. at ¶ 65, 68.)

The DOH denies that Amna was ever subjected to inappropriate or abusive conduct in the

workplace.  Multiple of her supervisors submitted affidavits stating that from the beginning of

Amna's time at DOH, there were many substantive problems with her written work, such as

incorrect grammar, insufficient detail, and lack of proper citation to the applicable laws and

regulations.  (E.g., Cygan Aff. at 6; Robertson Aff. at 3, 7-8.)  As a result, Amna's SODs

required a great deal of editing and revision.  (Id.)  The record also indicates that from 2002 to

2006, Amna was given several verbal counseling sessions in response to complaints that had

been received from nursing homes regarding Amna's behavior and attitude toward residents and

staff.  (Sammut Aff., Ex C, E; Cygan Aff., Ex. A, B.)  The record contains a letter from White

Oaks Nursing Home dated November 14, 2006 reporting multiple complaints about Amna's on-

site behavior.  (Sammut Aff., Ex. D.)  This letter was one of the issues listed in the one-month

suspension notice that Amna claims she received in April 2007.  (Pl. Opp'n , Ex. 31.)

The DOH further denies that any actions were taken because of Amna's religion or

national origin.  Team leader Ann Marie Sammut stated in her affidavit that to her knowledge no

one ever commented on Amna's accent, but only on the fact that Amna sometimes had difficulty

articulating her thoughts.  (Sammut Aff. 6-7.)  Team leader Regina Cygan admitted that she may have asked Amna to repeat herself, but only because Ms. Cygan wears a hearing aid.  (Cygan Aff. at 12.)  In regard to the incident where Amna was asked not to speak in her native language, Ms. Beck stated in her affidavit that she merely asked Amna to keep her voice down during a confidential meeting.  (Beck Aff. at 2-3.).  Mary Ann Robertson stated that Amna was never purposefully excluded from overtime when it was needed on her teams, and her work time was never calculated on a different basis based on how she arrived at work.  (Robertson Reply Aff. at 2, 4.)  Vastie Vinson stated that employees had the option of being picked up at a central location on Long Island to ride to work sites in a state-provided car, and that Amna chose not to meet at this central location because she was the only team member who lived in Queens.  (Vinson Aff. at 11-12.)

The DOH contends that employees are regularly rotated among survey teams, and that Amna's transfer to the Complaints Unit was merely an attempt to alleviate tensions between conflicting personalities, facilitate more harmonious teamwork, and provide Amna with a comparable position away from the co-workers about whom she had repeatedly complained. The DOH also argues that, once in the Complaints Unit, it was consistent with company policy for Amna to be removed from the ASPEN-ACO computer program, because complaints investigators worked only off a program called ASPEN-ACTS.  (Solis Aff. at 2.)

Amna voluntarily retired from the DOH in September 2009.

## II.    Standard of Review

Summary judgment is appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 23 (1986); Belfi v. Prendergast, 191

F.3d 129, 135 (2d Cir. 1999).  The Court's function on summary judgment is not to resolve

disputed issues of fact but only to determine whether there is a genuine issue of fact to be tried.

See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  "Credibility determinations, the

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury

functions, not that of a judge."  Id. at 255; see also Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir.

1997).

The court is required to view the evidence in the light most favorable to the nonmoving

party, and draw all reasonable inferences in that party's favor.  See Adickes v. S.H. Kress & Co.,

398 U.S. 144, 157 (1970); Delaware & Hudson Railway Co. v. Consolidated Rail Corp., 902

F.2d 174, 177 (2d Cir.1990).  Nevertheless, the non-moving party cannot rest on mere

allegations or denials but must instead set forth specific facts showing there is a genuine issue for

trial.  See Fed. R. Civ. P. 56(e); Weinstock v. Columbia University, 224 F.3d 33, 41 (2d Cir.

2000) ("[U]nsupported allegations do not create a material issue of fact.").  No genuine issue

exists unless there is sufficient evidence favoring the nonmoving party for a rational trier of fact

to find for that party.  If the evidence is merely colorable, or is not significantly probative,

summary judgment may be granted.  Anderson, 477 U.S. at 249-50 (citations omitted).  The

Second Circuit has made clear that "the salutary purposes of summary judgment—avoiding

protracted, expensive and harassing trials—apply no less to discrimination cases than to . . .

other areas of litigation."  Weinstock, 224 F.3d at 41 (internal quotation marks omitted).

### III.    Disparate Treatment

Amna argues that many of her allegations amount to disparate treatment on the basis of

national origin or religion, in violation of Title VII.  The DOH responds by arguing that several

of Amna's allegations are time-barred, and the remainder are insufficient to make out a prima

facie case under the <u>McDonnell Douglas</u> burden-shifting framework.

### A.  Statute of Limitations

In order to bring a Title VII action, a plaintiff must first file a charge with the EEOC or

comparable state agency within 300 days of the alleged discriminatory conduct.  See <u>Pikulin v.</u>

<u>City Univ. of New York</u>, 176 F.3d 598, 599 (2d Cir.1999); <u>Collier v. Boymelgreen Developers</u>,

2008 WL 835706, at *2 (E.D.N.Y. 2008).  Because Amna did not file her DHR complaint until

October 10, 2006, the DOH contends that only those events falling within the 300 days prior to

that date may be considered for Amna's disparate treatment claim.  This would eliminate from

consideration any events prior to December 15, 2005 (most of paragraphs 12-25 of the

complaint).  Amna responds by citing case law holding that for claims of <u>hostile work</u>

<u>environment</u>, a court may consider acts outside the limitations period, so long as the charge is

filed within 300 days of at least one act contributing to that hostile work environment.  See, e.g.,

<u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 118 (2002).  The Court does not disagree

with this proposition as it pertains to Amna's hostile work environment claim, but agrees with

the defendant that allegations of "discrete discriminatory acts are not actionable if time barred,

even when they are related to acts alleged in timely filed charges."  <u>Morgan</u>, 536 U.S. at 114; <u>see</u>

<u>Patterson v. County of Oneida</u>, 375 F.3d 206, 220 (2d Cir. 2004).  Therefore, with regard to

Amna's disparate treatment claim, allegations that pre-date December 15, 2005—such as, for

example, her allegation that she received a lower pay grade upon starting work than she had

initially been offered—are time-barred.

### B.  Prima Facie Case

Employment discrimination claims under Title VII are analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  To establish a prima facie case, the plaintiff must show: "[1] membership in a protected class; [2] qualifications for the position; [3] an adverse employment action; and [4] circumstances surrounding that action giving rise to an inference of discrimination."  Collins v. NYC Transit Authority, 305 F.3d 113, 118 (2d Cir. 2002); see McDonnell, 411 U.S. at 802.  If the plaintiff succeeds in making this prima facie showing, the burden then shifts to the defendant to demonstrate a legitimate, nondiscriminatory reason for the actions taken.  Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d Cir. 1994).  Once such a reason is articulated, the burden shifts back to the plaintiff to demonstrate that the reason offered is merely a pretext for discrimination.  Id.; see Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253-54 (1981).

The DOH argues that Amna fails to make a prima facie showing that an adverse employment action was taken against her, or that the circumstances surrounding any such an action give rise to an inference of discrimination.

### 1.      Adverse Employment Action

An adverse employment action, for purposes of a Title VII disparate treatment claim, must be "more disruptive than a mere inconvenience or an alteration of job responsibilities," and may include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation."  Leibowitz v. Cornell University, 584 F.3d 487, 499 (2d Cir. 2000) (quoting Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir.2000)) (internal quotation marks omitted).

Here, Amna alleges that she was discriminated against in a variety of ways: she was reassigned to different survey teams and eventually to the Complaint Unit; her supervisors yelled at her and told her they could not understand her; her work was excessively scrutinized or improperly edited; she received an disproportionate workload without the proper computer programs to complete it; she was not given rides to job sites in state cars; and she was denied equal opportunities to make overtime.

Only a few of these allegations could, if properly substantiated, constitute adverse employment actions: the job reassignments, the excessive workload, and the denial of opportunities to make overtime.  It is well-established that being yelled at or having one's work criticized do not constitute adverse employment actions under Title VII.  See Weeks v. N.Y. State Div. of Parole, 273 F.3d 76, 86 (2d Cir.2001), abrogated on other grounds by Morgan, 536 U.S. 101 (2002) ("It hardly needs saying that criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."); Smalls v. Alstate Ins. Co., 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005) (allegations of verbal abuse, insults, or unfair criticism are not adverse employment actions); Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 248 (S.D.N.Y. 2001) ("Courts in this district have found that reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse employment actions.") (collecting cases). Furthermore, even crediting Amna's claim that she was the only team member who did not ride to job sites in a state car, she has failed to present any evidence supporting her allegation that her mode of transportation affected how her hours were calculated or that it otherwise resulted in disciplinary, pecuniary, or other adverse action being taken against her.

While job transfers may in some circumstances qualify as adverse employment actions, the Court has no difficulty concluding that Amna's transfers between survey teams and then to the Complaint Unit do not.  It is undisputed that none of these reassignments involved a change in pay, benefits, or seniority, and there is no evidence in the record that they placed Amna in a position "that was materially less prestigious, materially less suited to [her] skills and expertise, or materially less conducive to career advancement."  Galabya, at 641; see Lanier v. IBM Corp., 319 F. Supp. 2d 374, 382 (S.D.N.Y. 2004) (same).

Amna argues that the transfer to the Complaint Unit involved a considerable change in duties, and thus qualifies as an adverse action.  While a transfer may qualify as an adverse employment action "if it results in a change in responsibilities so significant as to constitute a setback to the plaintiff's career," Galabya, 202 F.3d at 641, the record here indicates that Amna's responsibilities in the Survey Unit and the Complaint Unit were in fact very similar and involved substantially the same skills.  In the Survey Unit, Amna performed recertification surveys of nursing homes with a team of surveyors.  In the Complaint Unit, it was her responsibility to conduct more abbreviated surveys of nursing homes in response to specific complaints.  In both positions, her ultimate task was to write SODs documenting noncompliance with applicable laws and regulations.  (Solis Aff. at 2-3.)  Amna's own characterization of the change in job responsibilities is simply that in the Survey Unit, she conducted multiple interviews at each nursing home, while in the Complaint Unit, she conducted one interview per visit in response to a specific complaint.  (Pl. Surreply at 66-67.)  Even reading the evidence in the light most favorable to Amna, this is not so significant a change in duties that it constitutes an adverse employment action.  See Ticali v. Roman Catholic Diocese of Brooklyn, 41 F.Supp.2d 249, 265 (E.D.N.Y.1999) (notwithstanding teacher's "disdain" for new assignment, her transfer was not

an adverse employment action because there was no evidence that it "obliged her to perform tasks that were less appropriate for her skills than her prior position or adverse to her in any other legally cognizable way").

Turning to Amna's remaining allegations, the Court observes that there is authority in this circuit supporting the proposition that the failure to offer overtime or the assignment of a disproportionately heavy workload can constitute adverse employment actions under Title VII. See Feingold v. New York, 366 F.3d 138, 152-53 (2d Cir. 2004); Duzant v. Electric Boat Corp., 81 Fed. App'x 370, 371 (2d Cir. 2003). Amna, however, fails to present evidence from which a factfinder could reasonably infer that materially adverse actions in fact took place. In support of her allegation that she was offered less overtime, she has submitted time sheets for herself and one colleague, Usha Mehta, which she claims show that Mehta was given significantly more overtime hours than she was. (Pl. Opp'n at 30, Ex. 18.) Yet Amna has offered no evidence that she and Mehta were even working on the same teams or project sites during those periods, or that they were otherwise in similar positions to receive overtime hours, which are assigned based on the needs of each survey. (See Robertson Reply Aff.) For some of the dates where Mehta accrued overtime, Amna was sick, on vacation, or not at work for other reasons. Moreoever, Amna conceded in her deposition that she never requested any additional overtime. (Pl. Dep. 198-99.) The Court concludes that Amna has failed show that her allegation of unequal overtime opportunities is anything more than unsupported speculation.

With respect to her claim of a disproportionately heavy workload, Amna has submitted only three pages of indecipherable records, which she urges the Court to interpret as evidence that in 2007, she was assigned twice as many cases as a Complaint Unit co-worker, Toby Bencivengo. (Pl. Opp'n, Ex.49.) Even if these excised records could be read in this manner,

Amna offers no explanation of the type of work involved in each listed case or how time consuming each was, and the record does not contain any other evidence that could support a rational inference that she and Bencivengo were in fact treated differently.  Similarly, concerning Amna's complaints about her lack of access to the ACO computer program, she presents no evidence that other Complaint Unit employees had different computer permissions than she did, and her claim that lack of ACO access interfered with her ability to do her work remains wholly unsubstantiated.  Given Amna's concession that she never requested overtime to finish her assignments, and the fact that she was never disciplined for failing to complete her work on time, it would be all the more unreasonable to infer an excessive workload based on such a negligible factual showing.

The Court therefore concludes that Amna has failed to raise a genuine issue of fact as to whether she was subject to an adverse employment action.

### 2.      Inference of Discrimination

Even if Amna had succeeded in making a prima facie showing of one or more adverse employment actions, she nonetheless fails to demonstrate that the circumstances surrounding these actions give rise to an inference of discrimination.  Such an inference may arise either through direct evidence of discriminatory animus, or through evidence that the plaintiff was treated differently from a "similarly situated" employee who was not a member of her protected class. See Shumway v. United Parcel Service, Inc., 118 F.3d 60, 63 (2d Cir. 1997); Goldman v. Administration for Children's Services, 2007 WL 1552397, at *4 (S.D.N.Y. 2007).

Amna's direct evidence of discriminatory animus consists largely of co-workers' isolated remarks, none of which were made in connection with the alleged employment actions, and many of which were not directed at Amna or even said in her presence.  The most inflammatory

of the allegations are Mr. Tumminelli's comment that Amna prays to animals, and Ms. Robertson's comment that Amna was "evil." However, Amna has only established that these comments took place through the hearsay of Nadine Target, which, as the defendant points out, may not be considered on summary judgment.[1] Spiegel v. Schulmann, 604 F.3d 72, 81 (2d Cir.2010) ("[I]n determining the appropriateness of a grant of summary judgment . . . the district court . . . may rely only on admissible evidence." (quotation marks omitted)); Howley v. Town of Stratford, 217 F.3d 141, 155 (2d Cir. 2000) ("Nor would testimony by [the plaintiff] that other firefighters told her of certain statements by [a colleague] likely be admissible to prove that [the colleague] actually made such statements, for her testimony offered for that purpose would be hearsay.")

Even if the Court were to consider these comments—in conjunction with the allegations that a co-worker laughed at an anti-Muslim cartoon, that someone left sexually-related literature on her desk, and that Ms. Vinson asked her if she had visited Iraq[2]—Amna would still fail to meet her burden. Such "stray remarks" and minor occurrences unrelated to the adverse employment action generally do not raise an inference of discrimination. See Young v. Daughters of Jacob Nursing Home, 2011 WL 2714208, at *5 (S.D.N.Y. 2011); Sicular v. N.Y.C. Dept. of Homeless Services, 2010 WL 423013, at *20 & nn. 27-28 (E.D.N.Y. 2010) (collecting cases). While Amna does allege that Ms. Robertson played a role in her transfer to the Complaint Unit, and that Ms. Vinson was responsible for overtime allocation, the Court concludes that one remark that Amna was "evil" (said outside Amna's presence) and one inquiry

---

[1] Amna has also submitted unsworn letters from Nadine Target, wherein Ms. Target recounts overhearing these comments firsthand. The defendants have objected to these letters as inadmissible, and the Court likewise may not properly consider them. See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham, 185 F.3d 61, 65 (2d Cir. 1999) ("[W]e have held that a district court should disregard an unsworn letter in ruling on a summary judgment motion.").

[2] These are the only allegations of discriminatory animus that took place within the 300-day limitations period.

about whether she vacationed in Iraq would not permit a rational factfinder to conclude that any of the substantive employment decisions affecting Amna were motivated by discriminatory animus.

Amna also fails to present adequate circumstantial evidence of discrimination, i.e., that she was treated differently from other similarly situated employees.  "To be 'similarly situated,' the individuals with whom [the plaintiff] attempts to compare herself must be similarly situated in all material respects." Shumway, 118 F.3d at 63 (emphasis added).  As noted above, in support of both her overtime and workload allegations, Amna has produced only inconclusive records comparing herself to one other employee, with no explanation of how they were similarly situated in terms of team assignments, availability, departmental roles, or any other relevant consideration.  (Pl. Opp'n, Ex. 18, 49.)  She makes no assertion that she was transferred to the Complaint Unit over some other employee who was similarly situated in all material respects.  Therefore, no inference of discrimination arises.

Summary judgment is granted to the defendant on the disparate treatment claim, because Amna has failed to make out a prima facie case of discrimination.

## IV.    Retaliation

### A.    Prima Facie Case

In order to establish a prima facie case of retaliation under Title VII, a plaintiff must present "evidence sufficient to permit a rational trier of fact to find [1] that she engaged in protected participation or opposition under Title VII, [2] that the employer was aware of this activity, [3] that the employer took adverse action against the plaintiff, and [4] that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action."  Cifra v. G.E. Co., 252 F.3d 205, 216

(2d Cir. 2001) (internal quotation marks omitted).  In evaluating whether this initial burden has been met, the court's role "is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive."  Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005).  If the plaintiff succeeds in making this showing, the burden then shifts to the defendant to offer a legitimate, nonretaliatory reason for the actions taken.  Jetter v. Knothe Corp., 324 F.3d 73, 75 (2d Cir. 2003).  Once the defendant has offered a legitimate reason for its actions, the burden shifts back to plaintiff to show pretext. Id.

Here, the defendant does not dispute that Amna's filing of a DHR complaint in October 2006 constituted a protected activity.  Moreover, the record indicates that Amna's supervisors were aware of the DHR complaint by December 2006 at the latest.  (Pl. Opp'n, Ex. 29.)  The defendant argues, however, that Amna fails to make a prima face showing that supervisors took adverse action against her, or that a retaliatory motive played a part in any such action.  The defendant argues further that even if Amna has met her initial burden, she fails to show that the legitimate reasons offered by DOH are mere pretext for retaliation.  The Court concludes that Amna has met her prima facie burden, but that she fails to rebut the nonretaliatory explanations proffered by the DOH.

### 1.    Adverse Actions

The standard for what constitutes an adverse action in a retaliation claim is different and less demanding than in a disparate treatment claim.  See Burlington Northern and Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006) ("[T]he antiretaliation provision, unlike the substantive provision, is not limited to discriminatory actions that affect the terms and conditions of employment."); Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 720 n.6 (2d Cir.

2010); <u>Flynn v. N.Y. State Div. of Parole</u>, 620 F. Supp. 2d 463, 490 (S.D.N.Y. 2009) ("[T]he standard that the plaintiff must meet is lower for a retaliation claim than for a disparate treatment claim.").  In a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  <u>White</u>, 548 U.S. at 68 (internal quotation marks omitted).  The primary retaliatory actions that Amna alleges are (1) that shortly after filing her DHR complaint, her colleagues did not attend her annual Ramadan breakfast; (2) that in April 2007 she was disciplined and threated with suspension; and (3) that she was shortly thereafter transferred to the Complaint Unit.

The first of these allegations does not constitute an adverse employment action, regardless of whether Amna was informed that Kathy Behan was telling employees not to attend the breakfast.[3]  The failure of colleagues to attend a social gathering falls into the category of "petty slights, minor annoyances, and simple lack of good manners" that would not deter a reasonable employee from supporting her charge of discrimination.  <u>White</u>, 548 U.S. at 68.

However, being threatened with a suspension, which was rescinded only when Amna agreed to give up vacation time, is sufficiently adverse for retaliation purposes—even more so because it was closely followed by a transfer to a different job position.  The Second Circuit has held that even a fully rescinded suspension may be sufficiently adverse to survive summary judgment in a retaliation claim.  <u>See</u> <u>Faul v. Potter</u>, 355 Fed App'x 527, 529-30 (2d Cir. 2007).  Moreover, it has indicated that some job transfers that do not meet the standards of a disparate treatment claim could nonetheless dissuade a reasonable employee from pursuing discrimination

---

[3] The defendant points out again that Amna only presents hearsay evidence that Behan in fact made such a comment.

charges in the context of a retaliation claim.  See Kessler v. Westchester Cty. Dep't of Social Servs., 461 F.3d 199, 204-209 (2d Cir. 2006).  The Court is therefore willing to conclude that Amna has made a prima facie showing that an adverse action was taken against her.

### 2.  Causal Connection

Amna must next show that a retaliatory motive played a part in the employer's adverse actions.  She may do so either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant."  Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); see Dixon v. City of New York, 2008 WL 4453201, at *12 (E.D.N.Y. 2008) (same).  The defendant argues that Amna has no direct evidence of retaliatory intent, and that the alleged adverse actions were too far in time behind the filing of the DHR complaint to raise an inference of retaliation.

Amna has, however, presented some direct evidence that, when read in the light most favorable to her, would permit a factfinder to infer a retaliatory motive.  The record contains emails sent among Amna's supervisors, which indicate that Amna was moved between survey teams and ultimately to the Complaint Unit because colleagues feared she would accuse them of discrimination.  An email from Kathy Behan, dated April 12, 2007, makes reference to Amna's DHR complaint and states, "I am concerned that at any time she is capable of making allegations against me leading to further legal actions, and based on per past allegations of my colleagues I am reluctant to have any interactions with her at this time."  (Pl. Opp'n, Ex. 29.)  Another email from Regina Cygan to managers, dated April 3, 2007, states, "Tanvir Amna continues to submit [emails] full of accusations against fellow employees and managers. . . . Surveyors don't want to

work on the same team as [her] due to fear of accusations against them."  (Pl. Opp'n, Ex. 34.)  A month later Amna was transferred to the Complaint Unit.  Amna also alleges that she was first told of her one-month suspension on April 12, 2007, around the same time these emails were sent.

       These emails could support the inference that Amna's supervisors took adverse actions against her <u>because</u> she filed a DHR complaint.  Thus, given that Amna's initial burden "is a light one," the Court concludes that she has made a prima facie showing of a retaliatory motive. <u>Raniola v. Bratton</u>, 243 F.3d 610, 624 (2d Cir. 2001).

### B.      Legitimate, Nonretaliatory Reasons & Pretext

       The DOH argues that many of its actions were taken in response to Amna's persistently problematic work performance and her difficulty getting along with other team members.  Because Amna fails to show that these reasons are mere pretext, summary judgment must be granted.

       In support of its reasons for taking disciplinary action against Amna, not only has the DOH produced affidavits from several of Amna's former supervisors stating that Amna's written reports fell far short of satisfactory, but it has also submitted evidence of at least eight different complaints from various nursing homes about Amna's on-site behavior from 2002 to 2006. (Sammut Aff., Ex. C, D, E; Cygan Aff., Ex. B.)  These complaints reported, <u>inter alia</u>, that Amna was rude to staff and residents, engaged in inappropriate questioning during surveys, and disrupted medical personnel from performing their duties.  For example, one counseling memo from Amna's personnel file states that in September 2005, at least 6 staff members at the Medford Multicare Center for Living complained about Amna's behavior and demeanor.  The

19

record also contains a November 2006 letter from the Program Director of White Oaks Nursing Home to DOH management, which states that Amna had violated the privacy of one of the residents by ordering a nurse to perform medical care in the dining hall, and that multiple residents had complained about her rudeness.  (Sammut Aff., Ex. D).  This complaint from White Oaks is one of the incidents cited in Amna's one-month suspension notice, along with several charges of insolence and disobedience to DOH supervisors while surveying another facility.  (Pl. Opp'n, Ex. 31.)  Given this evidence of repeated problems with Amna's behavior over the course several years, the Court finds that the DOH has clearly articulated a legitimate reason for deciding to suspend her in early 2007.

With regard to Amna's transfer to the Complaint Unit, the DOH argues that this was a legitimate attempt to alleviate tensions in the DOH workplace, and to find Amna a comparable position where she wouldn't have to work with the colleagues about whom she had repeatedly complained.  Ms. Cygan stated in her affidavit that during Amna's time in the Survey Unit, she had frequent personality conflicts with her team members, which at times resulted in Amna being transferred to other teams or other team members requesting to be reassigned themselves. (Cygan Aff. at 5-6.)  The emails  between DOH supervisors that Amna herself has submitted confirm this account—that the teams' work was being impeded due to personality conflicts between Amna and other employees, that staff morale was decreasing, and that colleagues feared any criticism of Amna's work would be construed as discriminatory.  (Pl. Opp'n, Ex. 29, 34.)  In addition, the record shows that in early 2007, Amna emailed supervisors on more than one occasion, accusing various colleagues of editing and criticizing her work too frequently, being impatient with her, or failing to offer her more assistance.  (Id., Ex. 20, 34.)

In light of these pervasive internal tensions, paired with the external complaints about Amna's behavior at nursing homes, one could easily find that it was legitimate (and perhaps even generous) for DOH management to assign Amna to the Complaint Unit, where she could engage in work that was comparable but more independent, and which did not require her to collaborate with the team members who were making her unhappy.  See Kemp v. Metro-North R.R., 2007 WL 1741256, at *35 (S.D.N.Y. 2007) (a personality conflict and the plaintiff's dissatisfaction with her work environment were legitimate reasons for a job transfer).  Given that, well after filing her DHR complaint, Amna continued to complain directly to her supervisors about the work environment in the Survey Unit, it would not be unreasonable for those supervisors to believe that a reassignment away from the alleged provocations was the only way to remedy the situation.  Moreover, Amna conceded in her deposition that she did not object to the transfer and perceived it as DOH's attempt to remedy the situation, which indicates that the DOH had reason to believe that the transfer was in the best interest of all.  (Pl. Dep. at 224-26.)

The defendant has succeeded in offering legitimate, nonretaliatory reasons for both the suspension and the transfer to the Complaint Unit.  The burden thus shifts back to Amna to show that these reasons are mere pretext for retaliation.

In order to rebut the employer's legitimate explanation for its actions, the plaintiff cannot rest on conclusory allegations or speculation, but must point to specific evidence that would permit a rational factfinder to conclude that a retaliatory motive was in fact a "substantial or motivating factor" behind the adverse action.  Raniola, 243 F.3d at 625; see Hongyan Lu v. Chase Inv. Servs. Corp., 412 Fed. App'x 413, 417 (2d Cir. 2011); Pointdujour v. Mount Sinai Hosp., 121 Fed. App'x 895, 897-98 (2d Cir. 2005).  "[M]erely disproving the defendant's legitimate explanation is insufficient; the plaintiff must produce competent evidence that 'the

employer's decision was motivated, at least in part, by an intent to retaliate against him.'"

Mayers v. Emigrant Bancorp, Inc., 2011 WL 1533125, at *9 (S.D.N.Y. 2011) (quoting El Sayed

v. Hilton Hotels Corp., 627 F.3d 931, 933 (2d Cir.2010)); cf. Weinstock v. Columbia Univ., 224

F.3d 33, 42 (2d Cir.2000) ("The plaintiff must produce not simply some evidence, but sufficient

evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered

by the [defendant] were false, and that more likely than not [discrimination] was the real reason

for the [employment action].") (internal quotation marks omitted).

Here, Amna offers nothing beyond her own personal belief that the DOH intended to

retaliate against her and that dissatisfaction with her work was misplaced.  She does not, for

example, present evidence that the complaints from nursing homes were fabricated, but merely

argues that nursing home staff must have misunderstood her actions.  (Pl. 56.1 Stmt at ¶¶ 76-78.)

Amna also argues that she has received positive feedback from other sources in the past, pointing

in particular to Christine Cain, who was Amna's DOH supervisor at sporadic times between

2001 and 2005, and who testified that she never had concerns about Amna's job performance.[4]

(Cain Dep., at 42-43.)   However, the critical issue is not whether Amna was well-regarded by

some, but whether DOH management in fact received a substantial number of complaints about

her work that provided legitimate, nonretaliatory reasons for disciplinary action.  See Warren v.

North Shore Univ. Hosp., 268 Fed. App'x 95, 97 (2d Cir. 2008) (plaintiff's "abundant evidence"

that she works well with patients was irrelevant where there was no material dispute that the

defendant had received negative reviews from colleagues that dissuaded him from hiring her).

Amna has not controverted the evidence that there were continual complaints about her job

performance, and she has failed to show that the DOH acted out of an improper motive in

---

[4] In further support of her argument that she does her work properly, Amna has submitted several unsworn letters of reference to which the defendant has made a valid hearsay objection.  (Pl. Opp'n, Ex. 20, 51, 52.)  The Court therefore does not consider them expressly, although they would not change the analysis here.

imposing what amounted to very mild disciplinary action more than six months after her DHR complaint was filed.

In addition, Amna's own arguments and submissions reflect that during her time in the Survey Unit, she had difficulty working with almost all of her colleagues and was tremendously unhappy. The DOH did not transfer her to the Complaint Unit until nearly seven months after she filed her DHR complaint, and did so in response to continued grievances from Amna and other employees that the Survey Unit's work was being impeded due to internal tensions. Even when read in the light most favorable to Amna, the record as a whole does not support the inference that the DOH's actions were anything other than a good faith attempt to alleviate persistent personality clashes. [5] The presence of a handful of remarks indicating that supervisors feared further allegations of discrimination is not enough to create a genuine issue of fact for trial.

As Amna has failed to present adequate evidence of pretext, summary judgment must be granted to the defendants on her retaliation claim.

## V.     Hostile Work Environment

To prevail on a hostile work environment claim, the plaintiff must show (1) a hostile work environment, (2) a specific basis for imputing the conduct that created that environment to the employer, and (3) membership in a protected class. See Distasio v. Perkin Elmer Corp., 157

---

[5] To the extent that Amna argues that her lack of access to the ACO computer program upon transfer to the Complaint Unit was also a retaliatory action, the defendant has presented evidence that complaint investigators only used a program called ACTS and didn't need ACO access. (Solis Aff., at 2-3; Pl. Opp'n, Ex. 40.) DOH IT Specialist David James stated in his affidavit that "to [his] knowledge, none of the employees in the Complaint Unit had access to the ACO program." (James Aff., at 2.) He also submitted an email wherein he instructed Amna how to access her former SODs through ACTS and explained to her that she did not need ACO to reference her prior work. (Id. at 2 & Ex. D.) As noted earlier, Amna has presented no evidence supporting her allegation that she was unable to complete her work due to lack of ACO access, or any evidence that other complaint investigators had different computer permissions than she did. Thus, she is unable to show that the legitimate, nonretaliatory reasons offered for her lack of ACO access are in fact a pretext for retaliation.

F.3d 55, 62 (2d. Cir.1998); Pugni v. Reader's Digest Ass'n, Inc., 2007 WL 1087183, at *13

(S.D.N.Y. 2007).  The defendant has not contested the second and third elements, so the Court's

analysis will focus on the first.

      To demonstrate a hostile work environment, the plaintiff must show that her workplace

was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently

severe or pervasive to alter the conditions of [her] employment."  Oncale v. Sundowner Offshore

Servs. Inc., 523 U.S. 75, 78 (1998) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).

"A work environment will be considered hostile if a reasonable person would have found it to be

so and if the plaintiff subjectively so perceived it." Brennan v. Metro. Opera Ass'n, 192 F.3d

310, 318 (2d Cir.1999).  Of course, the plaintiff must also establish that the hostile conduct

occurred because of her membership in a protected class.  Alfano v. Costello, 294 F.3d 365, 377

(2d Cir. 2002).  The defendants argue that Amna has failed to present evidence that the conduct

in her workplace was sufficiently "severe or pervasive," or that it was based on her protected

status.  The Court agrees.

      The factors that a court should consider in evaluating a hostile work environment claim

include "the frequency of the discriminatory conduct; its severity; whether it is physically

threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance."  Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597,

605 (2d Cir. 2006) (quoting Harris, 510 U.S. at 23) (internal quotation marks omitted).

Generally, the alleged incidents "must be more than 'episodic; they must be sufficiently

continuous and concerted in order to be deemed pervasive.'"  Alfano, 294 F.3d at 374 (quoting

Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)).  In reaching this determination,

courts may consider even facially neutral incidents, "so long as a reasonable fact-finder could conclude that they were, in fact, based on [the plaintiff's protected status]." Id. at 378.

Here, the allegations carrying any hint of discriminatory overtones are (1) the 2001 phone call to Christine Cain from the DOH central office inquiring about whether Amna had been promoting her religion in the office, (2) the remarks made by Dennis Tumminelli and Mary Ann Robertson about Amna being "evil" and "praying to animals," which Amna learned of only through hearsay, (3) Amna's supervisors telling her they could not understand her, (4) a co-worker laughing at an anti-Islam cartoon, (5) a co-worker, Usha Mehta, telling Amna that she did not like Pakistanis, (6) the incident where sexually-related literature was left on Amna's desk, (7) team leader Vastie Vinson asking Amna if she had just returned from Iraq, and (8) the incident where Amna was speaking in her native language and Christine Beck asked her to be quiet.

Even crediting Amna's characterization of these incidents, which the defendant disputes, they do not rise to the level of pervasive and continuous abuse that is typically required to make out a hostile work environment claim—especially given that these incidents allegedly took place over six years of employment, at various times between 2001 and 2007. Incidents that are merely "infrequent and episodic" are insufficient to make out a hostile work environment claim. Alfano, 294 F.3d at 380. The remarks by Tumminelli and Robertson (setting aside the hearsay objection) were not directed at Amna or said in her presence. Even when considered in combination with the cartoon, the sexually-related literature, and the singular comments from Mehta, Vinson, and Beck, the entire picture adds up to no more than a set of isolated incidents and "stray remarks," unconnected from any substantive employment decision, which cannot defeat summary judgment. See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001) ("[S]tray remarks of a decision-maker, without more, cannot prove a claim of

employment discrimination."); <u>Payton v. City Univ. Of New York</u>, 453 F. Supp. 2d 775, 785 (S.D.N.Y. 2006) ("Nor can 'offhand comments,' 'isolated incidents,' 'stray remarks,' or [the plaintiff's] subjective belief constitute a viable claim.").  This conclusion is strengthened by the fact that the discriminatory nature of nearly all these incidents is far less apparent than other types of remarks that have been found not actionable.  <u>See</u> <u>Rivera v. Potter</u>, 2005 WL 236490, at *5 (S.D.N.Y. 2005) (holding that tirade of cursing and use of a racial slur directed at plaintiff "do feature discriminatory language, [but] they are, at best, stray remarks, and as such, are insufficient to defeat summary judgment."); <u>see also</u> <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110-111 (2d Cir. 1997) (noting that whether racial slurs constitute a hostile work environment depends upon "the quantity, frequency, and severity" of their use).

The other allegations are similarly mild.  The mysterious phone call to Christine Cain was not made by any of Amna's own supervisors and does not appear to have had any actual effect on Amna's work conditions (other than for the brief moment when Amna was told about it).  Amna herself surmises that the call was likely precipitated by an event a few days prior, when Amna gave Dennis Tumminelli literature about Islam in the office.  (Pl. Opp'n at 10.) Finally, to the extent that Amna alleges that she was frequently asked to repeat herself, it requires too far of an "inferential leap" to conclude that these requests were discriminatory, let alone that they are abusive enough to support a claim for hostile work environment.  <u>Watt v. New York Botanical Garden</u>, 2000 WL 193626, at *7 (S.D.N.Y. 2000) ("To make the inferential leap that plaintiff would like requires [the inference] that 'I can't understand the way you speak' is a comment about the plaintiff's accent, and that, in turn, a comment about the plaintiff's accent suggests underlying bias against persons of Jamaican origin.")

Moreover, the incidents above are not sufficient to cast Amna's other facially neutral allegations—such as that she was yelled at, her work was excessively edited, she was threatened with suspension, and she was transferred to the Complaint Unit—in a discriminatory light.  See Manessis v. NYC Dep't of Trasp., 2003 WL 289969, at *5-6 & n.6 (S.D.N.Y. 2003) (a small number of arguably discriminatory remarks not enough to infer that several facially  neutral incidents were motivated by discriminatory animus) (citing Alfano, 294 F.3d at 378); St. Louis v. N.Y. City Health and Hosp. Corp., 682 F. Supp. 2d 216, 234 (E.D.N.Y. 2010) (The combination of stray remarks, receipt of negative job evaluations, disciplinary warnings, and micro-management do not support a claim of hostile work environment).  As the Court concluded in the analysis of Amna's disparate treatment and retaliation claims, the undisputed facts overwhelmingly indicate that any disciplinary actions taken against Amna were justified on the basis of complaints from nursing homes about her job performance, and that her reassignments were a legitimate response to pervasive discord between Amna and many members of the Survey Unit staff.   Amna has presented only conclusory speculation and subjective beliefs about her colleagues' discriminatory animus to rebut this evidence.

While the Court does not dispute that Amna found her superiors rude and unfair, or that she felt micro-managed, a rational factfinder could not infer discriminatory abuse when the record reflects only personality clashes and general dissatisfaction with Amna's work performance.  As the Second Circuit has observed:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals.

Alfano, 294 F.3d at 377.  Even if, as Amna contends, her supervisors' conclusions about her work were misplaced and their responses were overly harsh, that alone does not imply that they were discriminatory.  See Fisher v. Vassar College, 114 F.3d 1332, 1337 (2d Cir. 1997) ("back-scratching, log-rolling, horse-trading, institutional politics, envy, nepotism, spite, or personal hostility" may be non-discriminatory reasons for employer's actions), abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc. 530 U.S. 133 (2000); Figueroa v. City of New York, 2002 WL 31163880, at *3 (S.D.N.Y. 2002) ("Courts have repeatedly granted summary judgment where the evidence points, not to gender or racial animus, but rather to the fact that plaintiff's personality is the motivation for the harassment.") (collecting cases).

The Court thus concludes that Amna has failed to present evidence that she was subject to the sort of severe, discriminatory harassment that is required to make out a hostile work environment.  Summary judgment is granted to the defendants on this claim.

## VI.    Other Claims

Amna has also brought claims under 42 U.S.C. § 1981 and the New York Human Rights Law.  The defendant argues that the Eleventh Amendment bars such claims against a state agency because there has been no congressional abrogation of state sovereign immunity, and New York has not consented to suit.  See Koumantaros v. City Univ. of N.Y., 2007 840115, at *4-5 (S.D.N.Y. 2007) (Eleventh Amendment bars § 1981 suit against state agency); Heba v. N.Y. State Div. of Parole, 537 F. Supp. 2d 457, 471 (E.D.N.Y. 2007) (Eleventh Amendment bars suit against state agency under New York Human Rights Law).  Amna's opposition papers do not refute this argument.

Accordingly, the § 1981 and state claims are dismissed.

**VII.    Conclusion**

For the stated reasons, summary judgment is GRANTED to the defendant in full.  The

Clerk of Court is directed to enter judgment and close the case.

SO ORDERED.

Dated: Brooklyn, New York
        September 30, 2011

_____/s/_____
Carol Bagley Amon
Chief United States District Judge